[No. 20861. Department One. May 10, 1928.]

YAKIMA SHOE COMPANY, *Appellant*, v. SARAH SUMMERS, *Executrix, et al., Respondents.*[1]

[1] CORPORATIONS (135) — EVIDENCE (101) — MISAPPROPRIATION OF CORPORATE ASSETS—DECLARATIONS AGAINST INTEREST BY PERSON SINCE DECEASED. The liability of the estate of an officer and manager of a mercantile corporation, for the amount of a shortage found to exist, is sufficiently established, where deceased, upon being charged with specific misappropriations, admitted them and that he had been taking money since the starting of business and that amounts taken could be shown by taking an account.

[2] EVIDENCE (127)—BOOKS OF ACCOUNT—RECORDS OF CORPORATIONS. Where an accused corporate officer admitted a shortage which he stated could be determined from the inventory and accounts, an inventory in his handwriting kept as a record of the company under his control may be assumed to be correct.

[3] CORPORATIONS (135)—MISAPPROPRIATION OF CORPORATE ASSETS— EVIDENCE—SUFFICIENCY. The amount of misappropriation of money by a corporate officer, since deceased, handling all the funds, is fixed with sufficient certainty, where decedent admitted peculations over a long period and had no idea of the amount, but stated it could be determined by the inventory and sales records, which was done.

Appeal from a judgment of the superior court for Yakima county, Hawkins, J., entered June 15, 1927, upon findings in favor of the defendants, in an action

[1]Reported in 267 Pac. 47.

against a stockholder's estate to recover for a misappropriation of corporate property.   Reversed.

*Snively & Bounds,* for appellant.

*Frank J. Allen, Charles H. Allen,* and *Richards, Gilbert & Conklin,* for respondents.

FRENCH, J.—The appellant, Yakima Shoe Company, was incorporated in the spring of 1923, and began doing business in March of that year.   This company operated both a wholesale store and a number of retail stores, the wholesale department being in the rear of one of the retail stores known as the West Side Boot Shop, located in the city of Yakima.   Mr. George Getty was president of the company, and P. S. Summers was secretary-treasurer, and others interested in the company were, with these two men just named, elected trustees.   We think it clearly appears from the record that P. S. Summers had general charge of all the invoices, moneys, stocks of goods, and records of the Yakima Shoe Company pertaining to the wholesale department; that he did the banking for the company; that all remittances were made to him, and that the records of the company showing business transactions were made either by him or under his direction.   In addition, Mr. Summers managed the retail store known as the West Side Boot Shop, it being, as stated, in the same building with the wholesale department. Sometime in the spring of 1925, Mr. Getty made an investigation of the actions of Mr. Summers in relation to the moneys of the shoe company, and on the second day of June, 1925, Mr. Summers was called to the office of Mr. Bounds, one of the attorneys for the shoe company, at which time Mr. Bounds interrogated Mr. Summers concerning the affairs of the company and made to him about the following statement: "You

have been acting as secretary-treasurer of the Yakima Shoe Company since its incorporation,'' and Mr. Summers replied that he had.  Mr. Bounds then stated:

"Early this year we started an investigation to find out just where the trouble lay, and as a result of this investigation Mr. Summers, it looks as though you are accountable for this shortage.  We are not going to make any threats or promises.  If there is anything to show that you have committed a criminal offense that is outside of our province.  We are not going to ask you to admit or say one word one way or the other until you have heard our side of it.  It will be your privilege to consult counsel.  We feel fairly sure of our grounds and are willing at this time to lay our cards on the table.''

There was then exhibited to Mr. Summers a memorandum slip showing a shortage in one transaction of twenty-three dollars, which Mr. Summers said he had pocketed.  Another transaction in which there was a shortage of one dollar.  Mr. Summers said he had taken that.  A number of other transactions were called to his attention, and in each instance Mr. Summers stated that he had himself kept the money.  He was then asked:  "How long have you been doing this?''  Mr. Summers answered, "Since the company has been organized.''  He was asked, "How much did you take?''  He replied, "I have no idea.''  He stated, however, that he intended to pay it back; was asked how he could pay it back if he had no idea how much he had taken, and at this time Mr. Summers stated,

"You can take the inventories, the purchases and the sales, find out how much we bought, how much we sold, how much there is on hand as shown by the inventory; the difference is what I owe the company.''

He was then asked if he was in position to pay it back, and said he thought he was; and he was then told that the company would make arrangements with ac-

countants to go over the books. Mr. Summers stated that he would render every assistance, and start right away, and that the matter could be finished very quickly. After this arrangement was made, Mr. Summers left the office, stopped at a hardware store, bought an automatic pistol, had it loaded, went back immediately to the store, sent the bookkeeper home, and in a very few moments was found dead with a bullet hole from the roof of his mouth out through the back of his head, with the purchased gun near by, and under circumstances from which we can draw no other conclusion than that of suicide.

Immediately after the death of Mr. Summers, certified accountants were employed to audit the books. A claim was filed against the Summers' estate, was rejected, and this suit followed.

[1] We think the admissions made by Mr. Summers in Mr. Bounds' office, taken in conjunction with the charges there made against him, clearly establish his liability. For a complete discussion of many of the points involved in this case see *Truelsch v. Northwestern Mutual Life Insurance Co.*, 202 N. W. (Wis.) 352.

[2] The summary prepared by the public accountants, and which was admitted in evidence, clearly indicates that there was a shortage, or a failure to account, for 3613 pairs of shoes. This, of course, is based on the assumption that the 1923 inventory was correct. This inventory appears in the handwriting of Mr. Summers, and was taken by Mr. Getty checking the merchandise and Mr. Summers writing it down. It was thereafter a record of the company in the custody and under the control of Mr. Summers. Starting with an inventory is the method which was suggested by Mr. Summers himself, in the conversation held in Mr. Bounds' office, and the summary and re-

port prepared by the public accountants seems to have followed out the method suggested by Mr. Summers for determining the amount of the shortage.

We think we may safely assume the correctness of the inventory taken in the due course of business and recorded in the handwriting of the man sought to be charged. *Chisholm v. Beaman Machine Co.,* 160 Ill. 101, 43 N. E. 796. See, also, Wigmore on Evidence, Vol. 3, §§ 1517 and 1561.

[3] The statement of facts in this case is long and involved, there being more than five hundred pages of typewritten matter, all of which has been carefully read and considered. The various exhibits have been checked with care, and there is but one conclusion to be reached upon the examination of this record, and that is that there was a shortage in either money or merchandise. The lower court seems to have reached this conclusion, but felt that there was a lack of that certainty of proof necessary to sustain a judgment, except as to the specific amounts admittedly pilfered. With this disposition of the case, we cannot agree. No one but Summers knew the extent or amount of his embezzlement, if he took money, or of his stealing, if he removed merchandise. The money of this corporation was all paid to him. The merchandise of this corporation was all in his care and keeping. He was admittedly not faithful to his trust. And the yardstick used in measuring his liabilities need not be applied with that nicety which might be required, had not his own dishonesty created the situation. *Seidell v. Taylor,* 86 Wash. 645, 151 Pac. 41. The plaintiff attempted to fix the amount of the liability in the way suggested by Summers himself as the only way to fix the amount, and unless he had kept a record of his delinquencies, we can conceive of no other way in which the amount could be ascertained. Although the

reports of the accountants seem to indicate that there were shortages prior to the 1923 inventory, the plaintiff has waived any claim beyond that date, because it was felt that the amount could not be determined with any degree of certainty. But as to those matters arising after the 1923 inventory, the plaintiff determined this loss in the manner suggested by the wrongdoer, and we think with that degree of certainty which would manifestly require some explanation of this shortage. There are no explanations except by innuendo. Having this in mind, and also the admissions and statements in the office of Mr. Bounds together with the necessary implication arising from the time, manner and mode of death, and taking also the testimony of the accountants for both sides, we can arrive at no other conclusion than that plaintiff's case has been established.

Three thousand six hundred thirteen pairs of shoes vanished during the two and one-half years of the time Summers was in charge of its stock, and the average price of the shoes handled during that time was $2.41 per pair. Just when, how, or under what circumstances these shoes were taken, or whether the shoes were sold and the purchase price taken, does not appear, and only Mr. Summers could tell. We think that a just determination of the matter will be to allow plaintiff the wholesale price of these shoes with interest from the date of the commencement of this action.

Reversed, with instructions to enter judgment against the community and estate for $8,707.33, additional with interest from the date of the filing of the complaint.

PARKER, MITCHELL, TOLMAN, and ASKREN, JJ., concur.